# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
**No. 21-1882V**

| | |
|---|---|
| MELANIE STANEK, | Chief Special Master Corcoran |
| Petitioner, | Filed: July 23, 2026 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Howard Gold,* Gold Law Firm LLC, Wellesley, MA, for Petitioner.

*Juliana Kober*, U.S. Department of Justice, Washington, DC, for Respondent.

**RULING ON ENTITLEMENT**[1]

On September 21, 2021, Melanie Stanek filed a petition for compensation under the National Vaccine Injury Compensation Program (the "Program").[2] Petition, dated September 21, 2021 (ECF No. 1). Petitioner alleges that an influenza ("flu") vaccine administered to her on August 28, 2020, caused her to develop a shoulder injury related to vaccine administration ("SIRVA")—a Table claim (although she also alleges a causation-in-fact claim based on the same set of facts).

The case was originally assigned to the "Special Processing Unit" ("SPU"), since it alleges a commonly-settled Table claim, but was transferred out of SPU because of fact questions too knotty for SPU resolution. The parties subsequently offered expert reports and briefed the matter

[1] Under Vaccine Rule 18(b), each party has fourteen (14) days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Ruling will be available to the public in its present form. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) [hereinafter "Vaccine Act" or "the Act"]. Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

for resolution by ruling on the record. *See* Petitioner's Motion, dated September 17, 2025 (ECF No. 40) ("Mot."); Respondent's Opposition, dated November 6, 2025 (ECF No. 41) ("Opp."); Petitioner's Reply, dated November 11, 2025 (ECF No. 43) ("Reply").

Now, having reviewed the record, expert reports, and other briefing, I find the Table elements for a SIRVA claim are met, despite the evidence of comorbid medical issues that either are plainly unrelated to the SIRVA (in particular, Petitioner's wrist complaints), or parallel with it (degenerative or preexisting cervical radiculopathy). Petitioner is thus entitled to damages. Thus, because much of Petitioner's treatment cannot be associated with her SIRVA, an exceedingly modest damages award in this case is called for.

## I. Factual Background

There is no medical record evidence that Petitioner experienced any pre-vaccination shoulder issues. At most, she has a self-reported history of cortisone and lidocaine injections in her right palm in 2019, and right thumb arthritis in June 2020. Ex. 4 at 47; Ex. 5 at 9−15. For her thumb arthritis, petitioner saw orthopedist Anthony L. Marcotte, D.O., at Orthopaedic Specialties, an apparent division of Florida Orthopaedic Institute. Ex. 5 at 9−15.

*Vaccination and Shoulder Treatment in Fall 2020*

Petitioner received the flu vaccine in contention on August 28, 2020, when she was 56. Ex. 1 at 2, 6; Ex. 3 at 16. One month later (September 29, 2020), she went to orthopedist Ioannis Pappou, M.D., at the Florida Orthopaedic Institute for a left shoulder evaluation. Ex. 3 at 14. She reported that two days after her vaccination, she started having "shotting [sic] pain up to her neck." *Id.* at 16. She also reported numbness, and described pain radiating down her hand and beginning "a couple of days" after the vaccination. *Id*.

On examination, Petitioner's range of motion ("ROM") was symmetric in both shoulders, except for "abduction rotation [was] $90^{o}/50^{oo}$" (although the record does not specify the relevant tested shoulder). Ex. 3 at 17. She had positive Neer, Hawkins, Jobe, Yokum, and Speed special tests, but negative O'Brien and Kim II tests. *Id.* An X-ray taken that day revealed arthritis in the left glenohumeral joint, with a large inferior humeral head osteophyte. Dr. Pappou diagnosed Ms. Stanek with "left shoulder bursitis after flu shot" and glenohumeral arthritis, and administered a cortisone injection into her left subacromial space. *Id*.

Two months passed before Petitioner again sought any kind of medical treatment. On December 10, 2020, she went back to Dr. Marcotte for treatment of right-hand pain that she reported had existed for six months. Ex. 5 at 6, 8. She also reported swelling in multiple joints, but denied any shoulder stiffness. *Id*. at 8. Exam revealed normal ROM in both shoulders and no

tenderness to palpation over either shoulder, and impingement testing, the empty can test, and the drop arm test were negative on both shoulders. *Id*. At most, Petitioner displayed some tenderness on her right wrist flexor carpi ulnaris muscle ("FCU"),[3] but a wrist X-ray was unrevealing. *Id*. at 8−9. Dr. Marcotte administered another cortisone injection, but this time into Petitioner's right FCU tendon sheath. *Id*. at 8. Petitioner was diagnosed with right wrist tendonitis, but no treatment for ongoing shoulder pain was discussed. *Id*. at 9.

*Treatment in 2021*

On January 22, 2021, Ms. Stanek visited her primary care provider ("PCP"), Michael P. Wanger, M.D., for an annual physical exam. Ex. 4 at 38. Her "Past Medical History" included a reference to "bursitis secondary to flu shot 8/2020, Left." *Id.* But this record otherwise makes no reference to existing or ongoing shoulder pain. *Id.* at 38−43. Dr. Wanger recommended a follow-up in six months. *Id*. at 42−43.

On February 3, 2021, Petitioner underwent a left shoulder MRI that Dr. Pappou had recommended in September 2020. Ex. 3 at 19. The MRI findings revealed a joint surface partial-thickness tear at the insertion of the junction of the infraspinatus and supraspinatus tendons, but involving more of the infraspinatus tendon. *Id*. There was also tendinopathy and a possible partial tear of the subscapularis tendon, plus long head biceps tendinopathy, strain, or partial tear, and degeneration and possible tear of the left glenoid labrum. *Id*. at 20. And it revealed Petitioner had fluid along the prominent biceps tendon sheath suggestive of tenosynovitis. *Id*. There was joint effusion and fluid in the subdeltoid and subacromial bursa, and bursitis could not be excluded. *Id*.

Dr. Pappou discussed the MRI results with Petitioner later that month. Ex. 3 at 7. Petitioner now reported worsening pain in her left shoulder, pain along her trapezius which radiated into her arm, and numbness and tingling beyond her elbow, with pain more evident when Petitioner turned her neck and moved her shoulder. *Id.* at 9. Dr. Pappou opined that Petitioner was experiencing a "combination of both shoulder joint and cervical pain." *Id*. at 10. Her range of motion in her left shoulder was also recorded as "L1 painful at the extremes." *Id.* A cortisone injection was administered into the left glenohumeral joint, she was prescribed a Medrol Dosepak and Celebrex, and Petitioner was scheduled for a June follow-up meeting (although the filed medical records do not confirm this visit occurred). *Id.* at 10−11.

On April 8, 2021, Ms. Stanek went back to her PCP for evaluation and management of migraine headaches. Ex. 4 at 45. She was prescribed medication, but no current shoulder complaints were documented or reported. *Id.*

[3] The FCU is a superficial muscle located on the medial/pinky side of the forearm, serving as a powerful wrist flexor and ulnar deviator. B. Lung & R. Siwiec, *Anatomy, Shoulder and Upper Limb, Forearm Flexor Carpi Ulnaris Muscle*, StatPearls (Jan. 30, 2024), https://www.ncbi.nlm.nih.gov/books/NBK526051/ (last visited July 22, 2026).

*Treatment After Case Initiation*

On October 18, 2021 (a month after the claim's initiation, and eight months since her last shoulder-related treatment), Petitioner returned for a follow-up visit with Dr. Marcotte for evaluation of ongoing right wrist pain that worsened with wrist movement or twisting. Ex. 7 at 11, 13. She also reported that the wrist cortisone injection she had received the prior December helped for a few months, but that "[s]he would like to have injections again." *Id.* at 13. Otherwise, she stated that she was experiencing "multiple joint swelling but [] no shoulder stiffness." *Id.*

A physical examination of both shoulders revealed no deformity, atrophy, bruising, swelling, redness, warmth, tenderness, or induration. Ex. 7 at 13. Petitioner's ROM was also normal in both shoulders, although the left shoulder had crepitus with motion, and she had normal strength and stability bilaterally, with negative impingement testing results. *Id.* And an X-ray performed during this visit revealed degenerative joint disease of the left shoulder region. *Id.* at 14. Petitioner received another cortisone injection into her left shoulder.

In mid-January 2022, Petitioner returned to Dr. Marcotte reporting "exacerbation of chronic [l]eft shoulder pain," without injury. Ex. 7 at 7, 9. Petitioner noted that her shoulder pain was radiating down to the elbow, that she had a difficult time reaching across her body and behind her back, and that her "shoulder ratchets [sic] with motion." *Id*. at 9. She also reported that she had experienced several weeks of pain relief after the last cortisone injection. *Id.*

An examination of Petitioner's left shoulder revealed normal ROM and strength. Ex. 7 at 9. Unlike her previous examinations, however, she displayed tenderness to palpation of the left bicipital groove and subacromial anterior and had some positive impingement tests. *Id*. The assessment included pain in the left shoulder, degenerative joint disease of the shoulder region, and primary osteoarthritis. *Id.* Dr. Marcotte administered a cortisone injection into her left shoulder, and Petitioner was advised to continue anti-inflammatories and stretching exercises and to follow up if symptoms did not improve. *Id.*

Nearly nine months later, in October 2022, Petitioner went back to Dr. Marcotte with complaints of left shoulder pain, right wrist pain, and left hip pain. Ex. 7 at 2. A physical exam revealed no shoulder deformity, atrophy, bruising, swelling, redness, warmth, or induration, however, and Petitioner displayed normal strength, ROM, and stability bilaterally. *Id*. at 4. A cortisone injection was again administered in her left shoulder. *Id.* No further medical records for any care or treatment of petitioner's shoulder pain have been filed in this matter.

## II. Expert Opinions

### A. Petitioner's Expert – Dr. Steven Graboff

Dr. Graboff, an orthopedic surgeon, prepared two written reports on Petitioner's behalf. Report, dated February 28, 2025, filed as Ex. 8 (ECF No. 35-1) ("First Graboff Rep."); Report, dated June 6, 2025, filed as Ex. 9 (ECF No. 37-1) ("Second Graboff Rep.").

Dr. Graboff received his medical degree from the University of California Irvine School of Medicine and completed his residency in orthopedic surgery at Harbor-UCLA Medical Center and Affiliated Hospitals. Curriculum Vitae, filed Sept. 17, 2025 (ECF No. 39-1) at 1. Dr. Graboff engaged in clinical practice for over thirty years and retired from practice in 2018. *Id.* Dr. Graboff was a member of the American Board of Orthopedic Surgery for thirty years. *Id.* at 2.

*First Report*

Dr. Graboff's first report began with a summary of Petitioner's medical records. First Graboff Rep. at 2–5. He emphasized one treating physician's notice of no preexisting issues in Petitioner's left shoulder, and the absence of medical records documenting any pain or treatment in her left shoulder. *Id.* at 2, 4. He did, however, note Petitioner's history of neck pain and herniated nucleus pulposus. *Id.* at 4.

After recounting Petitioner's clinical history and the treatment she received for her shoulder pain, Dr. Graboff proceeded to offer his opinions on a "more probable than not basis and to a reasonable degree of medical certainty." First Graboff Rep. at 5. Petitioner suffered a vaccine injury after injection which manifested within forty-eight hours "with a massive inflammatory response and pain." *Id.* The MRI taken on February 3, 2021, documented this inflammatory response, by showing subacromial and subdeltoid bursitis. *Id.* Despite the presence of other shoulder pathology, such as Petitioner's tear at the infraspinatus and supraspinatus tendon junction, Dr. Graboff asserted these were pre-existent and did not cause Petitioner to seek medical care. *Id.* However, the joint effusion and fluid in the subdeltoid and subacromial bursa and prominent fluid in the biceps tendon sheath are "clearly direct pathological inflammatory results" of Petitioner's vaccination. *Id.*

According to Dr. Graboff, Petitioner's left shoulder pathology was aggravated by an inflammatory response from the influenza vaccine. First Graboff Rep. at 5. A vaccination into the left shoulder deltoid muscle can cause such injuries, as supported by his own practice. *Id.* It is not unusual that inflammatory disease in the left shoulder will cause radiating symptoms in the neck and down the left upper extremity, which is consistent with Petitioner's symptoms and pre-existing

cervical spine disease. *Id.* at 6. It was therefore logical that, because Petitioner had no symptoms prior to the vaccine, the vaccine was the proximate cause of the onset of these symptoms. *Id*.

Dr. Graboff next presented the medical records from Florida Orthopaedic Institute to demonstrate the progression of Petitioner's injury from the time of her vaccination to February 2021. First Graboff Rep. at 6. Petitioner's left shoulder range of motion was only minimally decreased, with an approximate 50% decrease as compared to Petitioner's right shoulder at a September 29, 2020, appointment. *Id.* Additionally, in December of 2020, Petitioner's forward flexion, abduction, internal, and external rotation were all found to be normal. *Id.* However, by February 12, 2021, Petitioner was only able to bring her arm behind her back to the L1 level. *Id.* Dr. Graboff contended that these findings are consistent with a progressive post-vaccination injury, and adhesive capsulitis specifically. *Id.*

Dr. Graboff did not find the lack of mention of Petitioner's left shoulder issues during her January and April 2021 appointments at Pinellas Country Primary Care to be concerning. First Graboff Rep. at 6. He opined that Petitioner was already being treated by specialists, so she would have no reason to bring up her left shoulder to her primary care physicians. *Id.* Dr. Graboff corroborated this by relying on his time treating patients. *Id.* He noted Petitioner's symptoms "clearly lasted greater than six months" as seen in the records of Dr. Marcotte. *Id.* Additionally, Dr. Pappou recognized Petitioner was suffering from a flu vaccination related injury. *Id.* at 7.

Dr. Graboff concluded by re-emphasizing that, without the vaccination, there is no medical evidence that Petitioner would have needed any medical care or treatment for her left shoulder. First Graboff Rep. at 7. There was no other condition present that would explain Petitioner's symptoms and she continuously sought out treatment for pain through October 4, 2022. *Id.*

*Second Report*

Dr. Graboff's second report reacted to Respondent's expert report. Second Graboff Rep. at 1. Dr. Graboff disagreed with Dr. Cagle's assertion that Petitioner's symptoms were consistent with a pre-existing cervical condition and degenerative arthritis. *Id.* Dr. Cagle, according to Dr. Graboff, unduly dismissed the abnormal findings in Petitioner's September 29, 2020 appointment with Dr. Pappou. *Id.* The difference in methods of documentation between Dr. Pappou and Dr. Cagle, according to Dr. Graboff, does not invalidate the substantiated claim of abnormality found during Dr. Pappou's examination. *Id.* Additionally, the medical record does not support speculation that Petitioner's cervical spine was the cause of her symptoms, because there is no history of treating physicians recognizing her cervical spine as causing symptoms. *Id.* at 1–2.

Petitioner's negative past medical history related to the left shoulder and treatment, Dr. Graboff argued, discredits Dr. Cagle's assertion that Petitioner is suffering from chronic

glenohumeral arthritis. Second Graboff Rep. at 2. Dr. Graboff highlighted Dr. Pappou's records that state there are no preexisting shoulder abnormalities and the arthritis in Petitioner's shoulder was asymptomatic. *Id.* The symptoms presented by Dr. Cagle as being indicative of an overt, symptomatic left shoulder arthritis only appeared after Petitioner received the influenza vaccine. *Id.* It is Dr. Graboff's opinion that the stiffness and pain associated with the left shoulder pre-existent degenerative arthritic disease was a direct and proximate result of the inflammatory response affecting the subdeltoid bursa, the subacromial bursa, and the biceps tenosynovitis and synovial sheath. *Id.*

Dr. Graboff next disagreed with Dr. Cagle's assessment of whether shoulder issues can lead to pain in the cervical region. Second Graboff Rep. at 3. Dr. Graboff explained it is well established in medical literature that problems in the shoulder can cause neck, cervical symptoms, and radicular type symptoms radiating down the associated upper extremity (citing L. Bokshan et al., *An Evidence-Based Approach to Differentiating the Cause of Shoulder and Cervical Spine Pain*, 129 Am. J. of Med. 913, 914–15 (2016), filed as Ex. 9-A (ECF No. 37-2) ("Bokshan"); K. Yoshihiro et al., *Overlapping, Masquerading, and Causative Cervical Spine and Shoulder Pathology: A Systematic Review*, 10 Glob. Spine J. 195, 204 (2019), filed as Ex. 9-B (ECF No. 37-3); T. Lauder, *Musculoskeletal Disorders that Frequently Mimic Radiculopathy*, 13 Phys. Med. Rehabil. Clin. N. Am. 469, 470–72 (2002), filed as Ex. 9-C (ECF No. 37-4); M. Daher et al., *Untwining the Intertwined: A Comprehensive Review on Differentiating Pathologies of the Shoulder and Spine*, 4 JSES Rev., Rep., and Tech. 385, 385 (2024), filed as Ex. 9-D (ECF No. 37-5)).

Dr. Graboff further explained how his initial report identified a medically acceptable temporal relationship between Petitioner's vaccine and her injury. Second Graboff Rep. at 3. And, he argued, Dr. Cagle had not sufficiently considered the objective evidence in the MRI establishing a significant inflammatory response in the subdeltoid bursa, subacromial bursa, and the long head biceps tendon sheath. *Id.* at 3–4. Dr. Graboff also proposed that Dr. Cagle's assertion that Petitioner's symptoms and imaging were consistent with severe arthritis disregarded the fact that the arthritis was documented as asymptomatic and only radiologic in nature. *Id.* at 4. The presence of radiologic degenerative arthritic disease in the shoulder does not mean the condition is painful and symptomatic, and the vaccination clearly had a temporal relationship to this development of pain. *Id.* at 4.

B. <u>Respondent's Expert – Dr. Paul J. Cagle</u>

Dr. Cagle is, like Dr. Graboff, an orthopedic specialist, and he filed a single written report for Respondent. Report, dated May 14, 2025, filed as Ex. A (ECF No. 36-1) ("Cagle Rep.").

Dr. Cagle is a Professor of orthopedic surgery at the Icahn School of Medicine at Mount Sinai. Curriculum Vitae, filed May 16, 2025 (ECF No. 36-6) at 1. Dr. Cagle received his medical degree from Loyola University Chicago Stritch School of Medicine before completing his residency at the University of Minnesota Academic Health Center and Medical School. *Id.* Prior to his current position, Dr. Cagle served as an Assistant Professor in the Department of Orthopedic Surgery at Southern Illinois University School of Medicine. *Id.* Dr. Cagle has published a variety of scientific articles and book chapters. *Id.* at 4–19. He is also a member of the American Academy of Orthopedic Surgeons and the American Orthopedic Association. *Id.* at 1.

Dr. Cagle began his report by stating that he did not believe Petitioner suffered a SIRVA. Cagle Rep. at 4. He noted that the initial appointment on September 29, 2020, with Dr. Pappou may have included a notation of a loss of abduction at this visit, but that this did not necessarily indicate a true loss of motion; instead, simply having pain in abduction *during* a range of motion is distinguishable. *Id.* Additionally, he stated that many of the described symptoms are consistent with a cervical pathology, such as the pain running down the arm and going up into the neck. *Id.* The symptoms of numbness similarly are consistent with a cervical radiculopathy as opposed to a shoulder pathology. *Id.* Petitioner also had imaging done demonstrating chronic degenerative arthritis. *Id.*

Subsequent medical appointments were, Dr. Cagle contended, consistent with his conclusion that Petitioner was not suffering a SIRVA. Cagle Rep. at 4. The February 12, 2021, appointment documented symptoms consistent with a neurologic process such as cervical radiculopathy. *Id.* at 4–5. The MRI findings at this visit reflected chronic degenerative shoulder pathology. *Id.* at 5. Dr. Cagle highlighted the identification of partial rotator cuff tears as evidence of a degenerative process. *Id.* He explained that partial rotator cuff tearing is a well-known chronic degenerative process, and people over the age of fifty often have asymptomatic tears of the rotator cuff. *Id.* (citing J. Sher et al., *Abnormal Findings on Magnetic Resonance Images of Asymptomatic Shoulders*, 77 J. Bone Joint Surg. Am. 10, 10 (1995), filed as Ex. A Tab 1 (ECF No. 36-2); S. Tempelhof et al., *Age-Related Prevalence of Rotator Cuff Tears in Asymptomatic Shoulders*, 8 J. Shoulder Elbow Surg. 296, 296 (1999), filed as Ex. A Tab 2 (ECF No. 36-3); H. Minagawa et al., *Prevalence of Symptomatic and Asymptomatic Rotator Cuff Tears in the General Population: From Mass-Screening in One Village*, 10 J. Orthop. 8, 8−10 (2013), filed as Ex. A Tab 3 (ECF No. 36-4)). The MRI findings thus do not support a finding of a traumatic or inflammatory injury. Cagle Rep. at 5.

The diagnosis of glenohumeral arthritis was then reaffirmed at three subsequent appointments, with no definitive evidence of Petitioner having a decreased range of motion in her left shoulder. Cagle Rep. at 5. Arthritic joints differ from adhesive capsulitis in that they become less mobile after overall wear and tear. *Id.* Adhesive capsulitis, on the other hand, is typically diagnosed in a non-arthritic joint, and refers to a healthy joint that has become stiff. *Id.*

Dr. Cagle emphasized the record's demonstration that neck manipulation was associated with reproduction of the left arm and shoulder pain. Cagle Rep. at 5. He explained that shoulder inflammation does not cause cervical symptoms, and Dr. Graboff's assertion that inflammatory disease affecting the left shoulder can cause radiating symptoms in the neck is unfounded in the literature. *Id.* Dr. Cagle next addressed the report of Dr. Graboff. *Id.* at 6. According to Dr. Cagle, Dr. Graboff suggested the vaccination in this instance was administered in the correct location (the deltoid muscle) yet still claimed it caused a SIRVA. *Id.* This demonstrates a lack of a viable mechanism in his expert report. *Id.* Additionally, Dr. Cagle did not see objective evidence that the vaccine was followed by a massive inflammatory response. *Id.* The X-ray and MRI findings are consistent with severe degenerative arthritis of the shoulder, including the mild fluid formations that can accompany arthritis. *Id.* Nowhere in the medical records does it state there was a massive inflammatory response. *Id.*

Dr. Cagle concluded his report by going through the causation prongs. Cagle Rep. at 7. He contended that based on the medical literature, the theory proposed for the vaccine injury lacked support. *Id.* (citing J. Cagle, *Shoulder Injury After Vaccination: A Systematic Review*, 56 Rev. Bras. Orthop. 299, 301–04 (2020), filed as Ex. A Tab 4 (ECF No. 36-5)). Instead, the symptoms are consistent with cervical/radicular findings and not an acute shoulder process. *Id.* Glenohumeral arthritis is a slow, degenerative condition that progresses over the years, and based on its severity at the time of imaging, clearly predated the administration of the influenza vaccine. *Id.* The second *Althen* prong is dispensed of because a logical sequence of events is unsupported by the clinical course. *Id.* at 7–8. Although Petitioner may have originally been documented to have pain caused by the bursal space in her left shoulder, the course of Petitioner's treatment indicates the arthritis was causing the pain and not the bursa. *Id.* at 8. Finally, because no new injury was incurred, there cannot be a temporal relationship between the pain in the left shoulder and the vaccination received by Petitioner. *Id.*

## III. Procedural History

As noted, this matter was initiated on September 21, 2021. *See* Petition. Respondent filed a Rule 4(c) Report in July of 2023 contesting Petitioner's right to compensation. *See* Respondent's Report, dated July 28, 2023 (ECF No. 18). This claim was then transferred out of the SPU in November of 2024. *See* Order, dated November 5, 2026 (ECF No. 31). Shortly thereafter, Petitioner filed an Amended Petition on December 6, 2024. *See* Amended Petition, dated December 6, 2024 (ECF No. 33). Expert reports were then filed, followed by briefing by both parties for a ruling on the record. This matter is now ripe for resolution.

## IV. Parties' Arguments

*Petitioner's Motion*

Petitioner argues she has satisfied the Table requirements for a SIRVA claim caused by the influenza vaccine. Mot. at 7. To do so, she presents the evidence that indicates she suffered from bursitis, partial-thickness rotator cuff tear, tendinitis, and tendinopathy. *Id.* at 7 (citing Ex. 3 at 17). Petitioner implies that the February 12, 2021, visit with Dr. Pappou satisfied the severity requirement of a Table claim, as this date was approximately six months after her vaccination. *Id.* at 8. The treating physicians diagnosed Petitioner with a flu vaccine injury based on both her testimony and the medical record. *Id.* (citing Ex. 3 at 17). Although not binding, the treating physicians' contemporaneous diagnoses have probative value. *Id.* (citing *D'Angiolini v. Sec'y of Health & Hum. Servs.,* No. 99-578V, 2014 WL 1678145, at *24 (Fed. Cl. Spec. Mstr. Mar. 27, 2014)).

After additionally arguing why she satisfies the *Althen* prongs, Petitioner next seeks to rebut the arguments set forth by Respondent's expert, Dr. Cagle. Mot. at 13–17. Petitioner criticized Dr. Cagle's diversion from the record, and emphasized the abnormal findings in Petitioner's appointments and the lack of any prior condition or cervical radiculopathy. *Id.* at 13–14. Petitioner states that shoulder symptoms can radiate into the neck. *Id.* at 14 (citing Bokshan at 913). The symptoms suffered by Petitioner cannot have been the result of pre-existent arthritis, contrary to Dr. Cagle's assertion. *Id.* at 15. The bursal effusions found in Petitioner are indicative of acute inflammatory symptomatic processes, not the result of a chronic pre-existing disease. *Id.* at 16 (citing Graboff Second Rep. at 2). The lack of mention of shoulder pain suffered by Petitioner in her January and April of 2021 appointments is not concerning, because Petitioner was already being treated by a specialist. *Id.* at 17. Finally, Petitioner addresses the contribution of pre-existing conditions, emphasizing that her arthritis was asymptomatic prior to her vaccination, and therefore such comorbidities could not be responsible for her symptoms. *Id.* at 18.

*Respondent's Brief*

Respondent argues that Petitioner cannot satisfy the elements of a Table claim (or a causation-in-fact claim for this matter). Opp. at 15–27. Petitioner also did not preponderantly establish that she suffered from her alleged shoulder injury for more than six months post receiving her vaccination. *Id.* at 15. In the first six months following her vaccination, Petitioner was only treated for shoulder pain on *two* occasions, at two medical appointments in which physical examinations revealed normal ROM and strength. *Id.* at 15 (citing Ex. 3 at 7, 14, 19; Ex. 4 at 35–38; Ex. 5 at 6–9; Ex. 4 at 35). Respondent distinguished this case from other cases where a treatment gap did not foreclose entitlement. *Id.* at 16 (citing *Portock v. Sec'y of Health and Hum. Servs.*, No. 21-1653V, 2024 WL 4224668, at *3 (Fed. Cl. Spec. Mstr. Aug. 13, 2024)). Here,

Petitioner's pain seemed close to resolution just three months and twelve days after onset. *Id.* at 16 (citing Ex. 5 at 8). Respondent also argues the treatment gap from February to October 2021 cannot be explained by Petitioner's glenohumeral Kenalog injection on February 12, 2021. *Id.* at 16–17 (citing Ex. 3 at 11). The resurgence of pain occurred too long after the severity timeframe to be related to the SIRVA. *Id.* at 17 (citing *Brennom v. Sec'y of Health and Hum. Servs.*, No. 21-51V, 2023 WL 7490248, at *4 (Fed. Cl. Spec. Mstr. Oct. 6, 2023)). The appointments on January 17, 2022, and October 4, 2022, contained no indication that Petitioner's symptoms were attributable to vaccination instead of an ongoing degenerative process. *Id.* at 17 (citing Ex. 7 at 2–9).

Respondent further emphasizes that three of Petitioner's medical visits occurred after she filed her petition. Opp. at 17 (citing Ex. 7). According to Respondent, these reports made in the context of litigation should be afforded little weight. *Id.* at 17–18 (citing *Duda v. Sec'y of Health and Hum. Servs.*, No. 19-31V, 2021 WL 4735857, at *8 (Fed. Cl. Spec. Mstr. Aug. 10, 2021)). The timing of Petitioner's treatment is indicative of a motivation to support her litigation rather than to treat her shoulder injury. *Id.* at 18.

Respondent also emphasizes that even if Petitioner was asymptomatic in her shoulder prior to the vaccination, this does not mean there was no inflammation or dysfunction already present. Opp. at 19. The medical record and expert reports indicate Petitioner had chronic shoulder degeneration. *Id.* at 20 (citing Cagle Rep. at 5). Additionally, Petitioner did not establish by a preponderance of evidence that her pain and reduced ROM were limited to her left shoulder. *Id.* at 20. Respondent posits the pain did not begin in her left shoulder, as she reported additional symptoms (numbness and tingling) and neck manipulation reproduced her left arm and shoulder pain. *Id.* at 20 (citing Ex. 3 at 9–10). Because Petitioner had pain outside of her affected shoulder, she has not satisfied the last QAI requirement. *Id.* at 21.

Respondent concludes his assessment of the Table claim by dispensing of the third QAI requirement. Opp. at 21. Other conditions or abnormalities unrelated to the vaccine could explain Petitioner's symptoms, specifically cervical/radicular symptoms. *Id.* at 21 (citing Cagle Rep. at 4). Degenerative joint disease or osteoarthritis may also explain Petitioner's symptoms more aptly than the vaccine, Respondent contends. *Id.* at 21. The symptoms after the gap in reports of shoulder pain, from February of 2021 to January of 2022, are consistent with such diseases. *Id.* at 22 (citing Ex. 7 at 5, 9). Thus, based on the evidence in the medical records, Petitioner cannot establish a Table injury. *Id.* at 22.

*Reply*

Among other things, Petitioner replies that her diagnosis is substantiated in the medical record. Reply at 4. Petitioner explains the treatment gap between February and October 2021 as

being a result of the COVID-19 Pandemic, and the fact that her shoulder injury was non-emergent and managed following an injection. *Id.* at 5. The medical record supports, according to Petitioner, the contention that Petitioner's arthritis was a distinct finding from the bursitis and tendinitis suffered by Petitioner. *Id.* Petitioner's pain in her bursa and complaints of tendonitis in the biceps are inflammatory conditions caused by the vaccine. *Id.* at 6 (citing First Graboff Rep. at 7).

Finally, Petitioner focuses on Dr. Graboff's report. Reply at 7. Petitioner argues Respondent has intentionally misstated Dr. Graboff's opinion when he expressed the view that the report was made on a "more probable than not basis." *Id.* (citing First Graboff Rep. at 5). Petitioner reaffirmed Dr. Graboff's opinions are held to a reasonable degree of medical certainty. *Id.* at 8. Petitioner requests Respondent be foreclosed from further contesting entitlement in this case. *Id.* Additionally, Petitioner criticized Respondent's assertions that Petitioner sought treatment to further bolster her claim. *Id.* at 8.

## V. Applicable Legal Standards

### A. *Petitioner's Overall Burden in Vaccine Program Cases*

To receive compensation in the Vaccine Program, a petitioner must prove either: (1) that he suffered a "Table Injury"—i.e., an injury falling within the Vaccine Injury Table—corresponding to one of the vaccinations in question within a statutorily prescribed period of time or, in the alternative, (2) that his illnesses were actually caused by a vaccine (a "Non-Table Injury"). *See* Sections 13(a)(1)(A), 11(c)(1), and 14(a), as amended by 42 C.F.R. § 100.3; § 11(c)(1)(C)(ii)(I); *see also Moberly ex rel. Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006).[4] Petitioner alleges a Table and causation-in-fact claim.

For both Table and Non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. Section 13(1)(a). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly*, 592 F.3d at 1322 n.2; *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991). In particular, a petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury."

[4] Decisions of special masters (some of which I reference in this ruling) constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Hum. Servs.*, 40 Fed. Cl. 625, 630 (1998). By contrast, Federal Circuit rulings concerning legal issues are binding on special masters. *Guillory v. Sec'y of Health & Hum. Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd* 104 F. App'x. 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Hum. Servs.*, No. 13-159V, 2014 WL 504728, at *7 n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

*Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Hum. Servs*., 451 F.3d 1352, 1355 (Fed. Cir. 2006). A petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. Section 13(a)(1).

B. *Legal Standards Governing Factual Determinations*

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. Section 11(c)(2). The special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." Section 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs*., 3 F.3d 415, 417 (Fed. Cir. 1993) (determining that it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is evidenced by a rational determination).

As noted by the Federal Circuit, "[m]edical records, in general, warrant consideration as trustworthy evidence." *Cucuras*, 993 F.2d at 1528; *Doe/70 v. Sec'y of Health & Hum. Servs.*, 95 Fed. Cl. 598, 608 (2010) ("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), *aff'd*, *Rickett v. Sec'y of Health & Hum. Servs*., 468 F. App'x 952 (Fed. Cir. 2011) (non-precedential opinion). A series of linked propositions explains why such records deserve some weight: (i) sick people visit medical professionals; (ii) sick people attempt to honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Hum. Servs.*, No. 11–685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras v. Sec'y of Health & Hum. Servs.*, 26 Cl. Ct. 537, 543 (1992), *aff'd*, 993 F.2d at 1525 (Fed. Cir. 1993) ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms").

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs*., No. 03–1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical

records are often found to be deserving of greater evidentiary weight than oral testimony—especially where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Hum. Servs*., 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. den'd*, *Murphy v. Sullivan*, 506 U.S. 974 (1992) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

However, the Federal Circuit has also noted that there is no formal "presumption" that records are accurate or superior on their face to other forms of evidence. *Kirby v. Sec'y of Health & Hum. Servs.,* 997 F.3d 1378, 1383 (Fed. Cir. 2021). There are certainly situations in which compelling oral or written testimony (provided in the form of an affidavit or declaration) may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs*., 69 Fed. Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. *Andreu*, 569 F.3d at 1379; *Bradley v. Sec'y of Health & Hum. Servs*., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez*, 2013 WL 1880825, at *3 (citing *Blutstein v. Sec'y of Health & Hum. Servs*., No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs*., 110 Fed. Cl. 184, 203–04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the result of a rational determination. *Burns*, 3 F.3d at 417.

C. *Analysis of Expert Testimony*

Establishing a sound and reliable medical theory often requires a petitioner to present expert testimony in support of his claim. *Lampe v. Sec'y of Health & Hum. Servs*., 219 F.3d 1357, 1361 (Fed. Cir. 2000). Vaccine Program expert testimony is usually evaluated according to the factors for analyzing scientific reliability set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594–96 (1993). *See Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (citing *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999)). Under *Daubert*, the factors for analyzing the reliability of testimony are:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592–95).

In the Vaccine Program the *Daubert* factors play a slightly different role than they do when applied in other federal judicial settings, like the district courts. Typically, *Daubert* factors are employed by judges (in the performance of their evidentiary gatekeeper roles) to exclude evidence that is unreliable or could confuse a jury. By contrast, in Vaccine Program cases these factors are used in the *weighing* of the reliability of scientific evidence proffered. *Davis v. Sec'y of Health & Hum. Servs*., 94 Fed. Cl. 53, 66–67 (2010) ("uniquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted"). The flexible use of the *Daubert* factors to evaluate the persuasiveness and reliability of expert testimony has routinely been upheld. *See, e.g.*, *Snyder*, 88 Fed. Cl. at 742–45. In this matter (as in numerous other Vaccine Program cases), *Daubert* has not been employed at the threshold, to determine what evidence should be admitted, but instead to determine whether expert testimony offered is reliable and/or persuasive.

Respondent frequently offers one or more experts in order to rebut a petitioner's case. Where both sides offer expert testimony, a special master's decision may be "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of Health & Hum. Servs*., 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe*, 219 F.3d at 1362). However, nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder*, 88 Fed. Cl. at 743 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 146 (1997)); *see also Isaac v. Sec'y of Health & Hum. Servs*., No. 08–601V, 2012 WL 3609993, at *17 (Fed. Cl. Spec. Mstr. July 30, 2012), *mot. for*

*review den'd*, 108 Fed. Cl. 743 (2013), *aff'd*, 540 F. App'x. 999 (Fed. Cir. 2013) (citing *Cedillo*, 617 F.3d at 1339). Weighing the relative persuasiveness of competing expert testimony, based on a particular expert's credibility, is part of the overall reliability analysis to which special masters must subject expert testimony in Vaccine Program cases. *Moberly*, 592 F.3d at 1325–26 ("[a]ssessments as to the reliability of expert testimony often turn on credibility determinations"); *see also Porter v. Sec'y of Health & Hum. Servs*., 663 F.3d 1242, 1250 (Fed. Cir. 2011) ("this court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act").

D. *Determination of Claim on Basis of Record*

I have opted to decide entitlement in this case based on written submissions and evidentiary filings, including the expert reports filed by each side. The Vaccine Act and Rules not only contemplate but encourage special masters to decide petitions on the papers rather than via evidentiary hearing, where (in the exercise of their discretion) they conclude that the former means of adjudication will properly and fairly resolve the case. Section 12(d)(2)(D); Vaccine Rule 8(d). The choice to do so has been affirmed on appeal. *See D'Toile v. Sec'y of Health & Hum. Servs.*, No. 15-85V, 2018 WL 1750619, at *2 (Fed. Cir. Apr. 12, 2018); *see also Hooker v. Sec'y of Health & Hum. Servs.*, No. 02-472V, 2016 WL 3456435, at *21 n.19 (Fed. Cl. Spec. Mstr. May 19, 2016) (citing numerous cases where special masters decided on the papers in lieu of hearing and that decision was upheld). I am simply not required to hold a hearing in every matter, no matter the preferences of the parties. *See Hovey v. Sec'y of Health & Hum. Servs.*, 38 Fed. Cl. 397, 402–03 (1997) (special master acted within his discretion in denying evidentiary hearing); *Burns*, 3 F.3d at 417.

## ANALYSIS

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a covered vaccine (a category including the version of the flu vaccine at issue). 42 C.F.R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder

> resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
> (ii) Pain occurs within the specified time-frame;
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g*. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A petitioner must meet all Table elements to succeed on a Table claim. Here, I find all are satisfied (although the injury itself was clearly mild, and therefore damages will appropriately be quite modest).

*Onset*

Respondent does not dispute that onset of Petitioner's post-vaccination symptoms likely occurred within 48 hours as set forth in the Vaccine Injury Table and QAI for a Table SIRVA. 42 C.F.R. § 100.3(c)(10)(ii) (required onset for pain listed in the QAI). Thus, based upon a review of the entire record, I find that Petitioner has met this Table requirement.

*Existence of Loss of ROM*

Petitioner's ROM was assessed multiple times after her vaccination, with varied (and sometimes inconsistent) results. From my review of the record, the first time Petitioner's ROM was noted to be abnormal was one month after receiving her vaccine. At her visit with Dr. Pappou in September of 2020, Petitioner's ROM was symmetric in both shoulders. Ex. 3 at 17. However, her "abduction rotation [was] $90^{o}/50^{oo}$." *Id.* Later visits revealed normal ROM in both shoulders through October 2022. *See* Ex. 5 at 6, 8; Ex. 7 at 13; Ex. 7 at 9; Ex. 7 at 2.

Respondent does not explicitly dispute the alleged decrease in ROM experienced by Petitioner. Although evidence of reduced ROM is sparse throughout the record, there is still at least one recorded instance of Petitioner's abduction rotation being abnormal. *See* Ex. 3 at 17. The Table does not require that a petitioner's reduced ROM must occur within forty-eight hours to prove causation, or that reductions in ROM be shown to be persistent or particularly severe. *See* 42 C.F.R. § 100.3(c)(10)(i)-(iv); *Portee v. Sec'y of Health & Hum. Servs.*, No. 16-1552V, 2018 WL 5284599, at *8, 11 (Fed. Cl. Spec. Mstr. Sep. 14, 2018). Rather, the QAI language only requires that the Petitioner suffers at least one documented instance of ROM loss *sometime* after vaccination—a standard Petitioner can meet on the basis of this record. At most, the documented limited ROM occurring one month after vaccination goes towards the mild intensity of Petitioner's SIRVA and will be considered while determining damages.

*Pain and ROM Issues Limited to Affected Shoulder*

Respondent argues that Petitioner's pain and reduced ROM were not limited to Petitioner's left shoulder. Opp. at 20. To support this proposition, Respondent cites to documented instances where Petitioner complained of other types of pain and symptoms, which Respondent contends are not indicative of the pain originating in the shoulder. For example, Respondent emphasizes Petitioner's report of numbness and tingling at her first presentation to her orthopedist, and her reports of pain radiating down her elbow into her hand. *Id*. at 20−21 (citing Ex. 3 at 16, 9−10). Additionally, Respondent notes that neck manipulation was associated with reproducing pain in Petitioner's shoulder, another symptom which Respondent purports is inconsistent with pain originating in the shoulder. *Id.* at 20.

Although these are accurate record citations, there is enough evidence of primarily shoulder-oriented concerns to find on this issue in Petitioner's favor. I have previously explained that under 42 C.F.R. § 100.3(c)(10)(iii), "claims involving musculoskeletal pain primarily occurring in the shoulder are valid under the Table even if there are additional allegations of pain extending to adjacent parts of the body, since the essence of the claim is that a vaccine administered *to* the shoulder *primarily* caused pain there." *Cross v. Sec'y of Health & Hum. Servs.*, No. 19-1958V, 2023 WL 120783, at *7 (Fed. Cl. Spec. Mstr. Dec. 2, 2022) (emphasis in original). Determining whether the pain is predominant to the shoulder is part of the balancing of evidence performed by special masters. The fact that a claimant reports some radiating pain does not completely invalidate a Table SIRVA.

Admittedly, Petitioner was noted to be experiencing "a combination of both shoulder joint and cervical pain." Ex. 3 at 10. But her symptoms primarily occurred in and originated from her vaccinated shoulder, particularly within the first six months of treatment. At her initial appointment after her flu shot in September of 2020, Petitioner received a left shoulder evaluation where she reported "shotting [sic] pain up to her neck" and received a cortisone injection in her left

subacromial space. *Id.* at 14, 16, 17. Although her following two appointments (one with Dr. Marcotte and one with Dr. Wanger) did not involve shoulder complaints, at Petitioner's appointment with Dr. Pappou in February 2021 she reported worsening shoulder pain. Ex. 5 at 6, 8; Ex. 4 at 38; Ex. 3 at 9. This was followed by a cortisone injection into Petitioner's left glenohumeral joint. Ex. 3 at 10−11. The medical records support the proposition that Petitioner had pain and ROM limitations in her left shoulder along with separate sensory symptoms. *See, e.g.,* Ex. 3 at 16 (describing numbness and pain radiating down hand); Ex. 3 at 7 (reporting numbness and tingling beyond her elbow). In summary, there is not preponderant evidence of non-shoulder pain that would defeat Petitioner's showing under this QAI, and any non-shoulder symptoms the record establishes were reported were more incidental in nature (and can be excluded from a SIRVA damages award as a result).

*Lack of Previous Shoulder Pain, Injury, and Dysfunction*

Respondent disputes that Petitioner has no history of pain, inflammation, and dysfunction in her left shoulder as required by the first QAI for a Table SIRVA. He points to the findings of Petitioner's MRI, which Dr. Cagle argues are indicative of "degenerative severe arthritis." Opp. at 19−20. Respondent admits that Petitioner's preexisting condition was asymptomatic, but maintains that this does not mean there was not already dysfunction or inflammation prior to the vaccination. *Id.* at 19.

However, the ailments highlighted by Respondent were either not causing symptoms prior to her vaccination, or (more importantly) were not diagnosed until *over a year after* Petitioner was being treated for her left shoulder pain related to her vaccination. Ex. 3 at 16, 17, 19−20 (documenting no pre-existing issues in shoulder, diagnosis of arthritis, and MRI results, respectively); Ex. 7 at 14 (documenting degenerative joint disease). Petitioner has no history in the record of shoulder pathology prior to receipt of her flu vaccination. I accordingly find by preponderant evidence that Petitioner had no history of shoulder dysfunction prior to her vaccination that would explain the symptoms and examination findings occurring after vaccine injection.

*No Other Condition or Abnormality is Present that can Fully Explain Petitioner's Symptoms*

Petitioner must also affirmatively rule out other explanations for her pain and related deficiencies. *See* 42 C.F.R. § 100.3(c)(10)(iv). This element of Petitioner's showing "requires consideration of a petitioner's medical condition as a whole." *Record v. Sec'y of Health & Hum. Servs*., 175 Fed. Cl. 673, 680 (2025). However, while another "condition or abnormality" at issue must qualify as an explanation for the petitioner's symptoms, it "need not be a better or more likely explanation." *French v. Sec'y of Health & Hum. Servs*., No. 20-0862V, 2023 WL 7128178, at *6 (Fed. Cl. Spec. Mstr. Sep. 27, 2023). A petitioner may fail to meet this requirement where there is

clinical evidence of an undiagnosed alternative condition. *Durham v. Sec'y of Health & Hum. Servs*., No. 17-1899V, 2023 WL 3196229, at *14 (Fed. Cl. Spec. Mstr. May 2, 2023) (noting that the regulation cites "clinical evidence of" various conditions).

However, Respondent cannot defeat a Table SIRVA claim by simply noting the presence of prior shoulder dysfunction (and/or chronic or comorbid degenerative issues). *See Grossmann v. Sec'y of Health & Hum. Servs*., No. 18-13V, 2022 WL 779666, at *16 (Fed. Cl. Spec. Mstr. Feb. 15, 2022). Alternative explanations based on conditions or abnormalities intrinsic to the shoulder raise the complex issue of whether Petitioner's "clinical history shows h[is] shoulder pathology wholly explains h[is] symptoms independent of vaccination." *See Lang v. Sec'y of Health & Hum. Servs*., No. 17-995V, 2020 WL 7873272, at *13 (Fed. Cl. Spec. Mstr. Dec. 11, 2020); *see also, Molina v. Sec'y of Health & Hum. Servs*., No. 20-845V, 2024 WL 4223393, at *8 (Fed. Cl. Spec. Mstr. Aug. 15, 2024) (finding that petitioner's diagnosis of calcific tendinitis precluded a Table SIRVA under the fourth SIRVA criterion because it is "a condition that can in itself present with acute onset of shoulder pain"). Ultimately, where the presence of another condition is apparent, a petitioner bears the burden of proving that the condition nonetheless "would not explain" her symptoms. *Durham*, 2023 WL 3196229, at *14.

Here, Petitioner has met her burden of proof for this SIRVA element. Petitioner was revealed to have arthritis in the left glenohumeral joint and degenerative joint disease of the left shoulder region in subsequent imaging performed after the SIRVA's onset, but Petitioner's symptoms are not fully explained by these previously asymptomatic conditions. *See* Ex. 3 at 17; Ex. 7 at 14. Petitioner was discovered to have arthritis in her left shoulder at her initial appointment post-vaccination but was also noted to have no pre-existing shoulder issues. Ex. 3 at 17. Petitioner's degenerative joint disease was discovered at her October 18, 2021, appointment after she received an X-ray. Ex. 7 at 14. This arthritis and degenerative joint disease do not fully explain Petitioner's MRI results that were corroborative of bursitis in February 2021. *See* Ex. 3 at 19−20. The findings of fluid along the prominent biceps tendon sheath and joint effusion and fluid in the subdeltoid and subacromial bursa cannot be explained fully by arthritis or degenerative shoulder disease that were either recognized as asymptomatic or only noted eight months after her last orthopedist appointment. *See* Ex. 3 at 19−20; Ex. 7 at 14. Thus, the totality of Petitioner's history suggests her injury was not likely limited to arthritis and degenerative conditions but also was (or primarily was) reflective of symptoms due to the SIRVA.

Respondent also tries to argue that any later symptoms Petitioner experienced could be attributable to Petitioner's degenerative joint disease and primary osteoarthritis. Opp. at 21−22. But these comorbid shoulder pathologies do not wholly explain her symptoms independent of vaccination—specifically, Petitioner's initial shoulder pain after vaccination, diagnosis of bursitis post-flu shot, and fluid along the biceps sheath. While it is conceivable a pre-existing rotator cuff

tear could account for these symptoms, there is not sufficient record evidence to support this theory.

Program determinations frequently find that a SIRVA has been established, even if it occurs concurrent with preexisting degenerative shoulder issues that were subclinical prior to the offending vaccination. And this case's record can support such a finding. The evidence of SIRVA in this case is met, along with other documented problems of glenohumeral arthritis, degenerative joint disease, primary osteoarthritis, and a joint surface partial-thickness tear of the junction of the infraspinatus and supraspinatus tendons. While these comorbidities (which cannot be attributed to the SIRVA) are relevant to the quantum of damages to be awarded, they do not impact Petitioner's success in this case of demonstrating a Table SIRVA.

*Petitioner's Symptoms Sequelae Persisted for More than Six Months After Onset*

To satisfy the Act's "severity requirement," a petitioner must show by a preponderance that he "suffered the residual effects or complications of [the alleged injury] for more than 6 months." 42 U.S.C. § 300aa-11(c)(1)(D)(i); *see Wright v. Sec'y of Health & Hum. Servs.*, 22 F.4th 999, 1002 (Fed. Cir. 2022); *Wagner v. Sec'y of Health & Hum. Servs.*, No. 17-1388V, 2019 WL 3297509, at *5 (Fed. Cl. Spec. Mstr. May 8, 2019). The Vaccine Act's severity requirement goes only to the *persistence* of pain, not its intensity. *See* 42 U.S.C. § 300aa-11(c)(1)(D)(i). "[E]ven mild symptoms that do not require medical care may satisfy the severity requirement," but "ongoing medical treatment for conditions unrelated to the alleged vaccine injury do not." *Wagner*, 2019 WL 3297509, at *5. Here, assuming an onset of August 30, 2020 (two days after vaccination – consistent with the onset she reported), Petitioner would need to show residual effects through at least early March 2021.

Respondent contests severity. He highlights Petitioner's medical appointments between her receipt of the vaccine and the end of February 2021, and the fact that they do not reference shoulder complaints. Opp. at 15. Thus, Petitioner denied shoulder stiffness at her December 10, 2020 appointment with Dr. Marcotte, and then did not mention shoulder issues to her PCP in January 2021. *Id*. at 15−16 (citing Ex. 5 at 8; Ex. 4 at 35). Respondent appears to reason that because Petitioner denied shoulder stiffness and had normal ROM at her appointment assessing her right hand, her shoulder pain had likely completely resolved by this point. *Id*. at 15−16 (citing Ex. 5 at 8).

After a careful review of the record, I find that this element is met despite Respondent's objections. One month after Petitioner received her vaccine, she was diagnosed with "left shoulder bursitis after flu shot," and reported pain in her left shoulder. Ex. 3 at 17, 16. Dr. Pappou also recommended Petitioner undergo an MRI of her left shoulder, which she completed on February 3, 2021. *Id.* at 19. This MRI revealed Petitioner had fluid along the prominent biceps tendon sheath

suggestive of tenosynovitis, joint effusion and fluid in the subdeltoid and subacromial bursa, and bursitis could not be excluded. *Id.* at 20. The results of the MRI, which Petitioner discussed with Dr. Pappou on February 12, 2021, are consistent with her diagnosis of "left shoulder bursitis." *Id.* at 7−11, 17. Additionally, at this same follow-up appointment Petitioner's worsening pain in her left shoulder was noted, in response to which Dr. Pappou administered a cortisone injection into her left glenohumeral joint. *Id.* at 10.

Respondent is correct that *within* the six-month severity period, there are some intervening medical appointments where shoulder issues were not discussed. But the February 2021 MRI and related records are sufficient to allow me to infer that she was likely still experiencing residual effects through the end of that same month and into March. It is simply more likely than not that a shoulder injury which was still causing pain after five months and fifteen days, and which was deemed worthy of additional treatment (in the form of a cortisone injection and prescribed Medrol Dosepak and Celebrex), would not have fully resolved within the next two weeks. *See* Ex. 3 at 10−11. Additionally, during the February visit, a follow-up visit was scheduled for June 2021. *Id.* Although there is no record evidence of this appointment taking place, Petitioner's medical provider felt it necessary to track the development of her symptoms about nine months after the receipt of her vaccine. *Id.* at 11. This is consistent with what is known about SIRVA, and the length of time it can take for the injury to fully heal and thus corroborates the severity finding in this case. Moreover, I balance the absence of record evidence showing treatment for the vaccine-related shoulder pain after February 2021 with the equal absence of evidence that the injury *had* resolved.

Thus, despite the lack of clear record evidence of sequelae related to the vaccine after February 12, 2021, I find that the severity requirement has been *just barely* met in Petitioner's favor. Although potentially less related to the original shoulder pain experienced by Petitioner, the records from October 18, 2021, onwards corroborate Petitioner was more likely than not suffering from mild shoulder pain across the six-month threshold. *See generally* Ex. 7.

Of course, a favorable severity finding does not mean that everything after that occurred in this case was vaccine-associated. From the date of Petitioner's vaccine, there is a roughly two-year treatment course for left arm pain, during which Petitioner endured multiple doctor's visits and six injections. But the latter portion of these records are likely *not* directly connected to the vaccine-related injury. Indeed, it becomes harder to link Petitioner's documented shoulder issues in February 2021 with what she received treatment for *after* October 2021, given both the length of this gap and the fact that six-months severity itself is not robustly substantiated. These are matters that will have an impact on damages calculations.

*All Other Table Elements Are Met*

Petitioner has established the requirements for a Table SIRVA claim. 42 C.F.R. § 100.3(c)(10). However, even if a petitioner has satisfied the requirements of a Table injury, he or she must also provide preponderant evidence of the additional requirements of Section 11(c), *i.e.*, receipt of a covered vaccine, *etc. See generally* Section 11(c)(1)(A)(B)(D)(E). Those elements are established or undisputed in this claim. I therefore find that Petitioner is entitled to compensation in this case.

## CONCLUSION

Although Petitioner has prevailed in carrying her entitlement burden, it is very evident from the facts of this case that damages should be modest. Petitioner's multiple comorbid conditions, along with an extremely mild treatment course that had minimal effect on Petitioner's daily life, warrants only a very moderate pain and suffering award (perhaps no higher than the mid-five figures range).

Based on the entire record, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA. Petitioner is entitled to compensation. The parties shall attempt to resolve damages, and shall file a settlement status report on their progress on or before October 30, 2026.

**IT IS SO ORDERED.**

s/ Brian H. Corcoran
Brian H. Corcoran
Chief Special Master